## TDG Partnership v. Regis Insurance Co.

C.P. of Chester County, no. 92-01496.

*Walter P. Eells,* for plaintiffs.
*William J. Schmidt,* for defendant.

GAVIN, *P.J.,* September 10, 1999—This is another case alleging bad faith conduct on the part of an insurer. Such cases seem to be flowing from the word processors of judges at both the trial and appellate court level with increasing frequency and oftentimes dissimilar results. The seeming dissimilarity in the opinions is perhaps best explained by the fact that there are varying theories of bad faith against insurers. For an excellent article noting the differences, the reader is referred to *Counterpoint, Bad Faith: The Pennsylvania Problem* (January 1999).

## BACKGROUND

The plaintiff partnership is a business enterprise involving members of the Kelsch family. As with many other entrepreneurs, they believed they had the skills necessary to run a restaurant and catering business and pooled their resources in order to purchase the premises located at 523 West Lancaster Avenue, Wayne, Pennsylvania. In the trivia category, and demonstrating how small a world it is, this writer is intimately familiar with the premises, having frequented same while an undergraduate and law student at Villanova University when it was known as the Connus Ale House. The property in question consisted of a two-story building with an attached railroad car that was used for dining.

Having settled on the location of their business, the Kelsch brothers prudently obtained insurance coverage from the defendant, Regis Insurance Company. Their

policy included coverage for damage to the premises, to the contents, and business interruption coverage.

While insurance is one of those necessary evils like death and taxes, most businesses go through their life cycle without ever having to call on the insurer to pay a claim. In fact, the insurance industry functions on the premise that claims paid will be less than premiums received. This is a concept that both the insurer and the insured well know, and while it may be aggravating to the insured to make premium payments, it is less aggravating than the claims process when the need arises. This is a classic case of the aggravation that every insured anticipates will occur when they have to call on their carrier to honor a claim. In fact, this case went beyond the level of aggravation one reasonably anticipates and degenerated into an adversarial process that in this writer's view was nothing less than an effort on the defendant's part "to stiff its insured."

## FINDINGS OF FACT

(1) Plaintiff is TDG Partnership, a general partnership engaged in the real estate business located at 77 Lionville Road, Exton, Pennsylvania.

(2) Plaintiff Carkrisme Inc. is a Pennsylvania corporation also with offices at 77 Lionville Road, Exton, Pennsylvania.

(3) The sole shareholders of the above-named corporation were three brothers: Jack Kelsch, James Kelsch and Tom Kelsch.

(4) Plaintiffs, TDG partnership and Carkrisme Inc., owned and operated a restaurant and catering business known and trading as "Conestoga Crossing" and "Ca-

tering by Judy," located at 523 West Lancaster Avenue, Wayne, Pennsylvania.

(5) The Kelsch brothers stood as the three general partners in TDG Partnership, which owned the land on which "Conestoga Crossing" was operated.

(6) The defendant is Regis Insurance Company, a Pennsylvania corporation engaged in the business of issuing insurance policies and is located at 1031 Old Cassatt Road, Berwyn, Pennsylvania.

(7) Regis issued a special multi-peril insurance policy, no. RM106147, to TDG Partnership and Carkrisme Inc. t/a Conestoga Crossing, Catering by Judy, Jack, James and Tom Kelsch. (Exhibit P-1.) The insurance policy was effective from November 25, 1990 to November 25, 1991 and provided coverage for the restaurant building in the amount of $824,000, personal property in the amount of $150,000 and loss of earnings/extra expense in the amount of $175,000.

(8) On February 26, 1991, a fire damaged plaintiffs' restaurant located at 523 West Lancaster Avenue, Wayne, Pennsylvania. Due to the fire, the restaurant and catering business ceased to operate.

(9) As a result of the fire, plaintiffs submitted a claim for building damage, personal property damage and loss of earnings/extra expense with the defendant Regis.

(10) Regis neither denied liability over the loss nor claimed any wrongdoing by plaintiffs. Yet, the claim became extremely problematic to resolve and eventually, on April 13, 1995, plaintiffs filed this civil suit against Regis, setting forth five separate counts: Count I—breach of contract—combined business interruption extra expense endorsement of the policy; Count II— breach of contract—building coverage claim; Count III—

breach of contract—contents claim; Count IV—bad faith; Count V—negligent misrepresentation.[1]

### Count I—Loss of Earnings/Business Interruption

(11) An endorsement of the insurance policy issued by Regis to plaintiffs (P-1; MP 15 05) entitled "Combined business interruption and extra expense endorsement," provides coverage at the insured location of $175,000 subject to a monthly limitation of 16-2/3 percent of the $175,000.

(12) The defendant, Regis, *knew* the terms of its own policy endorsement and that its purpose was to pay for loss of earnings and necessary extra expense "in order to continue as nearly as practicable the normal operation and normal gross earnings of the insured's business following damage to or destruction of real or personal property." (P-1; MP 15 05 ¶1(b).)

(13) Ongoing operation of a restaurant requires payment of full-time staff, as well as other fixed and continuing expenses such as rent, taxes and utilities.

(14) Plaintiff John Kelsch testified that it was essential that the insured, during the period the restaurant was closed for restoration, receive immediate cash flow under this coverage provision of the policy. Thus, in an effort to receive this coverage, plaintiffs timely submitted to Regis a list of cost estimates for the first and second months of business interruption by letter dated March

---

1. It should be noted that on February 12, 1992, plaintiffs had to file a writ so as not to be precluded from seeking relief from Regis by the statute of limitations. It also should be noted at this juncture that before this trial, Count V was withdrawn by plaintiffs and Count I was the subject of a release between the parties.

21, 1991 addressed to George Morrison who Regis had assigned to adjust the loss. (P-00109.)

(15) Plaintiffs also provided the supporting data to Regis (P-00110/P-00119) and based on this data requested the first month's reasonable payment by March 29, 1991.

(16) The evidence at trial revealed that by the end of April 1991, Regis' adjuster, George Morrison, as well as Regis' accountant, Harris Margolis, had projections of monthly interruption expense through the month ending July 25, 1991. (P-00175.) In fact, by letter dated April 22, 1991, Regis' accountant, Harris Margolis, set forth his compilations of the insureds' business interruption for George Morrison. These figures never changed.

(17) John Kelsch testified that he never saw Margolis' projections which explains his constant expressions of concern to Regis that his claim be resolved as well as his inquiries as to whether Regis required additional information to resolve this portion of the claim. (P-00139.) On May 8, 1991, John Kelsch wrote to George Morrison, pleading that the claim be resolved. (P-00219.)

(18) Despite numerous requests for payment, the defendant, without reasonable explanation, *took more than seven months* to pay plaintiffs *anything* under this coverage.

(19) The objective and verifiable information in the defendant's possession mandated the conclusion that the plaintiffs were entitled to the limits of this particular coverage.

(20) Despite the objective evidence, on September 18, 1991, the defendant demanded an appraisal under the policy provisions. (P-00322.)

(21) Both parties appointed an appraiser, but neither side could agree on an umpire. (P-00365.)

(22) After months of trying to determine an acceptable umpire and *22 months after the fire,* the insureds' counsel advised Regis that under any interpretation of the policy, the balance of the limits was due and that it was unconscionable not to pay on the claim. (P-00398-00405.)

(23) On January 19, 1993, the Honorable Lawrence E. Wood appointed Robert Supplee, Esquire, as the umpire.

(24) On February 24, 1994, Robert Supplee submitted his award to the court. (P-514B-514D.) The award stated that the policy provides coverage for up to six months to reopen, yet Regis chose to offer only five months of coverage. Mr. Supplee noted that TDG asserted that at least six months was required to reopen and that Regis made no attempt to justify the five-month limitation. Thus, Robert Supplee used a six-month calculation for his award entered in favor of the insureds. Plaintiffs wrote to Regis and requested payment in accordance with the award by May 3, 1994, pursuant to the policy clause providing that Regis shall make payment within 30 days after presentation and acceptance of proof of loss.

(25) Upon the court's receipt of the reappraisal award, Judge Wood corresponded with both parties' counsel and suggested that each submit an order for his signature. *The defendant, however, did not respond to either the umpire, plaintiffs or the court.*

(26) Plaintiffs then notified Regis that it would act upon the court's request and sent a letter to Judge Wood, along with a suggested order, requesting confirmation of the

appraisal award. Judge Wood waited 12 days during which Regis still did not respond. Thereafter, on May 16, 1994, Judge Wood confirmed the award and entered judgment against Regis for $91,000 which amount constituted the $175,000 policy limits awarded by Mr. Supplee, less $84,000 previously paid to plaintiff by Regis. In response to this order, Regis filed a petition to open or strike the judgment, which was dismissed by Judge Wood on September 19, 1995. Regis then appealed this decision to the Superior Court of Pennsylvania, which appeal was denied on May 30, 1996.

(27) After the appeal was denied, payment of the balance finally was made by Regis on August 9, 1996, *66 months after the fire*. The insurance policy provided that Regis should ordinarily pay submitted claims within 30 days.

## Count II—Building Loss Coverage Claim

(28) Under form MP 00 13 (P-1), the insureds had coverage for damage to buildings or structures as the result of fire.

(29) The parties retained contractors to prepare estimates of repair based on the damage to the building.

(30) On April 25, 1991, Regis advanced $20,000 towards building damage loss. By June 13, 1991, after plaintiffs signed a proof of loss (P-00249), Regis determined that the total loss for damage as of that date was $93,500 and prepared a second advance of $53,800.

(31) The proof of loss contained a "hold back" in the amount of $18,700. At the trial, Regis representatives only indicated that they required a "hold back" because that's the way they did things. There was no indication how the hold back figure was calculated under the terms

of the policy and for how long it would be enforced by Regis.

(32) The insureds' contractor determined that there was additional damage which amounted to $18,378, which was submitted to Regis for payment after repairs were substantially completed, in November 1991.

(33) Two pieces of evidence, one, a copy of a hand-written note authored by George Morrison which is almost illegible, demonstrates that Regis intended to refuse to pay plaintiffs any additional monies for loss submitted by the insured. (P-358; P-359.)

(34) On December 19, 1991, the insureds demanded that Regis pay the "hold back" in the amount of $18,700 on the first proof of loss and also demanded payment of the additional $18,378 on the subsequent proof of loss. (P-421.)

(35) *Regis finally paid the "hold back" of $18,700 in February 1993, two years after the loss.*

(36) Despite repeated requests, Regis has refused, without explanation, to adjust the second claim for coverage on building damage submitted in the amount of $18,378.

### *Count III—Contents Claim*

(37) Another one of the coverages of the multi-peril insurance policy which Regis issued to plaintiffs provided for the "business personal property of the insured," as set forth in MP 00 14. (P-1.)

(38) The insureds also purchased, by endorsement, replacement cost coverage, as designated in form MP 04 20 (P-1) for the contents of the building at the insured location.

(39) Under this contract, the clause "actual cash value" was thereby replaced by the term "replacement cost (*without deduction for depreciation*)." (emphasis added)

(40) Following the fire, an inventory of the damaged personal property was compiled by both parties on or about February 27, 1991, and was substantially completed about March 5, 1991.

(41) Separate inventories for liquor (P-0079) and for food and related products (P-0084) were submitted three weeks later by the insureds to Regis.

(42) The parties developed different totals, and then engaged in a series of attempts to resolve their differences.

(43) The insureds were concerned that additional items of contents damage might later be discovered which they would want covered.

(44) George Morrison believed that $39,985 represented a fair value to settle the contents claim. (P-00267.) In an effort to settle the claim, Regis presented plaintiffs with a "sworn statement of proof of loss" (P-00269) which it told the insureds to sign if they wanted payment. In fact, the sworn proof of loss stated that "[t]he whole loss and damage [for the contents] was $39,985." (P-00269.)

(45) Plaintiffs were unwilling to sign the sworn proof of loss related to their contents claim and once again, under the provisions of the policy, the parties resorted to the appraisal process.

(46) On October 11, 1991, almost eight months after the fire, Regis tendered a partial payment to plaintiffs for the contents claim in the amount of $25,000. (P-00335.)

(47) On October 31, 1991, the appraisers submitted their determination which stated "[w]e further agreed that our appraisal of the personal property claims was agreed at $43,500 as the replacement cost loss and that depre-

ciation of $6,525 resulted in an actual cash value loss of $36,975." (P-00345.) From this determination, Regis determined that it only had to pay plaintiffs the actual cash value, notwithstanding the replacement cost coverage plaintiffs had purchased.

(48) Following the appraisers' determination, Regis tendered payment in the amount of $11,975 to plaintiffs. (P-00366.) Regis also submitted to the plaintiffs, along with this payment, a subrogation receipt (P-00367) which purported to relieve itself from any further liability as a "full settlement of all claims and demands . . . ." By memo dated December 19, 1991, plaintiffs flatly rejected the $11,975 payment as the final figure to cover the personal property claim. (P-00374.) This memo was followed by a response from Regis' president, Richard DiLoreto, which advised his employee, George Morrison, to "do nothing with the December 19, 1991 letter." (P-00376.)

(49) Meanwhile, plaintiffs submitted claims for additional contents losses which were determined following the original inventories, generally for cleaning and repair of sundry personal property.

(50) Despite numerous demands for action on this claim, from 1991 through present, Regis has failed to approve, deny or in any way adjust these additional contents losses, consistent with the written detective of Richard DiLoreto. (P-00390 and 00394.)

(51) Throughout 1992, the insureds' counsel made further requests for payment of at least the $11,975, as being a further undisputed sum. These demands were to no avail.

(52) On February 25, 1993, the insureds' counsel again demanded payment of at least the sum of $11,975, and prepared a proper subrogation receipt for that additional

advance that would not foreclose the insureds' ability to make or collect on additional claims under the policy. (P-00424.)

(53) Twenty-four months after the fire, Regis paid a second advance on the contents/personal property claim. Regis, however, has refused to respond to the supplemental claims and has failed to tender to date the depreciation figure deducted in 1991.

## DISCUSSION

At issue before the court is whether Regis' actions with regard to its handling of this claim following the fire constitute bad faith under 42 Pa.C.S. §8371.

Plaintiffs contend that they have clearly and convincingly made out a case for bad faith under 42 Pa.C.S. §8371 as the defendant, Regis, had no reasonable basis for delaying the insureds' claims and knew or recklessly disregarded any lack of a reasonable basis.

"The Pennsylvania Supreme Court has long held that an insurer must act with the 'utmost good faith' toward its insured." *Romano v. Nationwide Mutual Fire Insurance Co.,* 435 Pa. Super. 545, 550, 646 A.2d 1228, 1231 (1994), citing *Fedas v. Insurance Co. of Pennsylvania,* 300 Pa. 555, 558, 151 A. 285, 286 (1930). (remaining citations omitted) In *D'Ambrosio v. Pennsylvania National Mutual Casualty Insurance Co.,* 494 Pa. 501, 431 A.2d 966 (1981), the Supreme Court of Pennsylvania declined to create a common-law remedy for an insurer's bad faith conduct. On February 7, 1990, the Pennsylvania Legislature promulgated 42 Pa.C.S. §8371 which created a statutory remedy for the bad faith conduct of insurers. There is no legislative history that specifically concerns the passage of the statute which was enacted as

part of a comprehensive insurance bill. See *Younis Brothers & Co. v. Cigna Worldwide Insurance Co.,* 882 F. Supp. 1468, 1471 (E.D. Pa. 1994). The bad faith statute provides:

"In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:

"(1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3 percent;

"(2) Award punitive damages against the insurer;

"(3) Assess court costs and attorney's fees against the insurer." 42 Pa.C.S. §8371.

Bad faith is not defined in section 8371. However, in 1994, the Superior Court of Pennsylvania clarified the meaning of bad faith in *Terletsky v. Prudential Property and Casualty Insurance Co.,* as follows:

" 'Bad faith' on part of insurer is any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent. For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (*i.e.,* good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith." *Terletsky,* 437 Pa. Super. 108, 125, 649 A.2d 680, 688 (1994), *appeal denied,* 540 Pa. 641, 659 A.2d 560 (1995), citing Black's Law Dictionary 139 (6th ed. 1990).

Recently, the Pennsylvania Superior Court defined bad faith as "any frivolous or unfounded refusal to pay proceeds of a policy." *Tenos v. State Farm Insurance Co.,* 716 A.2d 626, 631 (Pa. Super. 1998), quoting *Romano v.*

*Nationwide Mutual Fire Insurance Co., supra* at 553, 646 A.2d at 1232.

Bad faith on the part of an insurer must be proven by the insured by clear and convincing evidence that "the insurer did not have a reasonable basis for denying benefits under the policy and that the insurer knew of or recklessly disregarded its lack of a reasonable basis in denying the claim." *MGA Insurance Co. v. Bakos,* 699 A.2d 751, 754 (Pa. Super. 1997); *Polselli v. Nationwide Mutual Fire Insurance Co.,* 23 F.3d 747 (3d Cir. 1994), citing *Cowden v. Aetna Casualty and Surety Co.,* 389 Pa. 459, 471, 134 A.2d 223, 229 (1957); *Hall v. Brown,* 363 Pa. Super. 415, 419, 526 A.2d 413, 416 (1987). "[T]he crux of a bad faith claim under section 8371 is the denial of coverage by an insurer when it has no good reason to do so." *Jung v. Nationwide Mutual Fire Insurance Co.,* 949 F. Supp. 353, 360 (E.D. Pa. 1997). (citations omitted) Additionally, "to recover under a claim of bad faith, the plaintiff must show that the defendant did not have a reasonable basis for denying benefits under the policy and that defendant knew or recklessly disregarded its lack of reasonable basis in denying the claim." *Terletsky, supra* at 125, 649 A.2d at 688. (citations omitted) Recklessness is required to support a finding of bad faith; mere negligence or an incorrect analysis of the law is insufficient to sustain liability. *Polselli, supra,* 23 F.3d 747.

Finally, the parameters of section 8371 may also be discerned by reference to analogous Pennsylvania insurance law, specifically the Unfair Insurance Practices Act. In *Romano v. Nationwide Mutual Fire Insurance Co., supra,* the Superior Court found "that the rules of statutory construction permit a trial court to consider, either

sua sponte or upon the request of a party, the alleged conduct constituting violations of the [Unfair Insurance Practices Act] or the regulations in determining whether an insurer . . . acted in 'bad faith.' " *Romano,* 435 Pa. Super. at 554, 646 A.2d at 1233, citing *MacFarland v. United States Fid. & Guar. Co.,* 818 F. Supp. 108 (E.D. Pa. 1993) (holding that the alleged conduct constituting violations of the UIPA and the regulations can be considered in determining whether the insurer acted in bad faith under 42 Pa.C.S. §8371); *Rottmund v. Continental Assurance Co.,* 813 F. Supp. 1104 (E.D. Pa. 1992) (holding that courts may look to other statutes upon the same or similar subjects to define bad faith under 42 Pa.C.S. §8371); *Coyne v. Allstate Insurance Co.,* 771 F. Supp. 673 (E.D. Pa. 1991) (holding that provisions of the UIPA can be utilized to describe conduct constituting bad faith). The UIPA defines unfair methods of competition and unfair or deceptive acts or practices in the business of insurance, specifically, section 1171.5 prohibits insurers from:

"Refusing to pay claims without conducting a reasonable investigation based upon all available information.

"Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed and communicated to the company or its representative.

"Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which the company's liability under the policy has become reasonably clear.

"Compelling persons to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts due and ultimately re-

covered in actions brought by such persons." 40 Pa.C.S. §1171.5(a)(10)(iv)(v)(vi)(vii) (respectively).

These prohibitions contained in the UIPA may also be illustrative of Regis' bad faith conduct in handling plaintiffs' claim.

With regard to plaintiffs' claim for loss of earnings/extra expense, Regis knew the terms of its own policy endorsement which plaintiffs purchased and knew that the purpose of this endorsement was to pay plaintiffs for loss of earnings and necessary extra expense "in order to continue as nearly as practicable the normal operation and normal gross earnings of the insureds' business damage to or destruction of real or personal property." (P-1; MP 15 05.) In addition, Regis never challenged liability. In order to receive this coverage under their policy, plaintiffs timely submitted to Regis a list of cost estimates for the first and second months of business interruption by letter dated March 21, 1991. The evidence at trial demonstrated that Regis' adjuster had projections of monthly business interruption expense through the month ending July 25, 1991. Even though Regis knew of its duty under the policy and possessed the projections of business interruption expense, Regis, without any reasonable explanation, took more than seven months to pay plaintiffs anything under this coverage provision. This alone supports the conclusion that Regis breached its duty of good faith and fair dealing with plaintiffs and was acting instead through some motive of self-interest or ill will toward its insured. However, there is more!

Regis further delayed payment to the insureds under the policy when it failed to respond to the court after the court-appointed umpire, Robert Supplee, Esquire, submitted his award. Indeed, the evidence demonstrates that

Regis completely ignored Mr. Supplee's award, ignored Judge Wood's directive to submit an order for his signature after the award was reached and then failed to pay plaintiffs the amount awarded. Instead, Regis appealed the matter to the Pennsylvania Superior Court, lost the appeal, and finally, after all of its avenues where closed down and after five years had elapsed since the fire, Regis made payment to plaintiffs for this claim. After hearing the testimony of Jack Kelsch and George Morrison on this issue, it became abundantly clear to this court that Regis had no reasonable basis for taking the actions which it did (note that Regis never even formally denied the claim) and that Regis' conduct was a gross deviation from its duty as an insurer.

We find *Polselli v. Nationwide Mutual Fire Insurance,* 1995 WL 430571 (E.D. Pa.) instructive on this first issue. In *Polselli,* fire occurred at the Polselli residence on January 1, 1991, causing extensive damage. Plaintiff's husband was the sole title owner of the premises and sole named insured on the homeowners policy entered into with Nationwide. Under the policy, Nationwide had the responsibility to reimburse the insured for damage to the building, contents and for "additional living expenses." Plaintiff, Regina Polselli, went forward and filed a claim with Nationwide since she was the sole occupant of the dwelling at the time of the fire. On January 28, 1991, plaintiff filed a proof of loss with Nationwide for the building claim, contents and ALE. Nationwide responded that it would not make payment under the policy until it determined the identity of the insured and investigated the loss. Sixty-one days after the fire, plaintiff filed suit against Nationwide, alleging bad faith in handling the claim. Nationwide made its first advance

on plaintiff's ALE claim on July 17, 1991, seven months after the fire.

With regard to the ALE payments, the court analyzed whether Nationwide's failure to make advance ALE payments, when it was not required to do so under the policy, was evidence of bad faith. The court stated that "[t]he question is not whether Nationwide was required under the agreement to make an advance payment, but whether its failure to do so in this case was 'frivolous or unfounded' and a breach of its duty of good faith and fair dealing toward its clients." *Polselli*, 1995 WL 430571 p. 5. In analyzing this issue, the court explained that as a result of the fire, Mrs. Polselli had become destitute, relying on the kindness of friends for shelter and food, and that Nationwide not only knew of her desperate condition, but used this as leverage to extract a favorable settlement on her ALE claim. The court reasoned that although Nationwide was justified in refusing an advance before it was able to establish coverage and the accidental origin of the fire, these questions were resolved in March 1991 and payment was not made until July 1991. The court stated that Nationwide's "duty of good faith and fair dealing toward its insureds meant it had an obligation to extend that policy to Mrs. Polselli, once it determined coverage and the accidental origin of the fire." *Polselli*, 1995 WL 430571 p. 6. Here, Regis never challenged liability and had projections for business interruption in April 1991. Yet, Regis continued to thwart plaintiffs' efforts to receive payment for this claim and dragged the process through five years of litigation until it finally made payment. These actions were not indicative of good faith on Regis' part toward its insureds as Regis had a duty, as did Nationwide to Mrs. Polselli,

under the policy to provide coverage to its insureds once coverage was determined.

Furthermore, the prohibitions contained in the UIPA are illustrative of Regis' bad faith conduct toward plaintiffs in handling the business interruption/loss of earnings portion of the claim. Specifically, Regis never challenged liability and, in April 1991, had projections of the loss of earnings/business interruption, projections which never changed, yet failed to pay the entire proceeds of plaintiffs' claim for five years. This conduct on Regis' part demonstrates that it was "[n]ot attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which the company's liability under the policy has become reasonably clear." 40 P.S. §1171.5(a)(10)(vi).

The evidence at trial demonstrated that Regis' conduct in handling the plaintiffs' claims for building and contents loss also rose to the level of bad faith on Regis' part. First, with regard to plaintiffs' contents claim, the policy contained a "replacement cost coverage endorsement" (P-1; MP 04 20) which specifically stated that "[t]he provisions of section I of this policy applicable to the property described as covered on a replacement cost basis are amended to substitute the term 'replacement cost (*without deduction for depreciation*) . . . .'" (emphasis added) Clearly, under the insurance policy, the insureds had purchased and paid for replacement cost coverage, and under the policy, depreciation was not to be deducted from whatever the amount of the loss was calculated to be. Regis had no reasonable basis to withhold depreciation and we find that Regis' decision to withhold depreciation was frivolous and constituted an

unfounded refusal on its part to pay proceeds of a policy. See *Tenos v. State Farm, supra.*

Similarly, with regard to plaintiffs' building claim, Regis, without explanation, withheld for two years a "hold back" payment in the amount of $18,700. Once again, Regis refused to pay the insureds the hold back amount, but finally did so two years after the loss. We find that Regis' conduct regarding this issue was a violation of its duty of good faith and fair dealing and find that it is further evidence of this company's bad faith conduct toward its insureds.

Additionally, in adjusting the building loss claim, Regis indicated that plaintiffs would not receive additional funds until they signed a subrogation form. That subrogation form related to the payment of legitimate contents coverage. (P-00367.) We find that this type of practice on Regis' part violates the UIPA §1171.5(a)(10)(xiii) which prohibits insurance companies from failing to promptly settle claims where liability has become reasonably clear under one portion of a policy, in order to influence settlements under other portions of policy coverage.

At trial, it became increasingly clear that the cumulative effect of Regis' handling of plaintiffs' claims under the policy was impregnated with Regis' frivolous and unfounded refusals to pay proceeds to the plaintiffs under the policy. The fact that plaintiffs had to wait for five years to receive full payment for lost earnings/business interruption clearly convinced this court that Regis had acted in bad faith in accordance with 42 Pa.C.S. §8371. This conduct, along with Regis' insistence on deducting depreciation, even though the policy precluded such a deduction, as well as Regis' hold back of funds without explanation for two years after the loss, further compelled

this court to conclude that Regis breached its duty of good faith and fair dealing through a motive of self-interest or ill will.

In an action arising under an insurance policy, a court may award to the insured punitive damages, attorneys' fees and costs if the court finds that the insurer acted in bad faith in refusing to pay the insured's claim. 42 Pa.C.S. §8371. Even though Regis never contested liability, it subjected its insureds to constant and unreasonable delays. The insureds were entwined in protracted litigation in order to receive the payments due under the policy, and the evidence at trial indicates that additional sums are still due and owing to the insureds. Based upon all of the foregoing, we find that Regis' actions toward its insured constituted bad faith and warrant an award of punitive damages,[2] attorneys' fees and costs under the statute.

## CONCLUSIONS OF LAW

(1) There was binding insurance coverage for the named insureds as of the date of loss, February 16, 1991.

(2) Plaintiffs proved by clear and convincing evidence that defendant Regis acted in bad faith pursuant to 42 Pa.C.S. §8371 as set forth in Count IV of their complaint.

(3) Due to Regis' bad faith conduct, plaintiffs have suffered damages which have been calculated in accor-

---

2. I specifically find that defendant's conduct was the antitheses of the insurer-insured relationship. When defendant was called upon to perform, it blithely ignored more than adequate data supplied by plaintiffs. Indeed, it ignored its own work product and offered sums less than it knew to be due. As I said earlier, it attempted "to stiff" its client. Such conduct is outrageous and warrants the imposition of punitive damages.

dance with 42 Pa.C.S. §8371(1) in the total amount of $182,981.22 as reflected in appendix 1.[3]

(4) Due to Regis' bad faith conduct, plaintiffs are entitled to punitive damages in accordance with 42 Pa.C.S. §8371(2) in the amount of $548,943.66.[4]

(5) Due to Regis' bad faith conduct, plaintiffs are entitled to attorney fees and court costs in accordance with 42 Pa.C.S. §8372(3), and plaintiffs are directed to proceed on this issue in accordance with the court's verdict which follows.

---

3. I read 42 Pa.C.S. §8371(1) to mean that for *each* year the claim was unpaid, the prime rate for that year was to be used. Otherwise, use of the prime rate for the year that the claim originated could be artificially high/low over the life period the claim remained unpaid. I then applied 3 percent to that total.

4. Pennsylvania law does not require that punitive damages bear a reasonable relationship to compensatory damages. See *e.g., Kirkbride v. Lisbon,* 521 Pa. 97, 555 A.2d 800 (1989). However, I am aware of the criticism surrounding some punitive damage awards and efforts to limit same. The appropriate response to such criticism is to demonstrate that reason, not emotion, drove the punitive damage award.

The previously found "bad faith" of defendants caused, in this writer's opinion, plaintiffs' business to fail because it lacked the very funds it had sought to have available by insuring itself with defendant. Every reasonable request by plaintiffs was met with stonewalling by defendant. When a dispute arose over inventory, plaintiffs chose a neutral party as arbitrator. Defendant insisted that its agent, whose work product was being questioned, serve as its arbitrator. Additionally, there are the instances of stonewalling referenced in the body of my opinion.

The evidence was overwhelming that defendant would not honor its obligation to plaintiffs. Insurers, because of their superior bargaining position vis-à-vis insureds, must not use that advantage to their gain. This is especially so where liability and damages are clear. If they do so, there must be no gain. Indeed, there should be significant negative consequences for such conduct.

An award of punitive damages three times compensatory damages is the appropriate negative consequence for this conduct.

## VERDICT

And now, September 10, 1999, after consideration of the evidence in the above matter, we enter a verdict in favor of the plaintiffs and against the defendant in the amount of $182,981.22 pursuant to 42 Pa.C.S. §8371(1) and punitive damages in the amount of $548,943.66 pursuant to 42 Pa.C.S. §8371(2).

We direct plaintiffs to submit to this court within 10 days from the date of this order a compilation of its attorneys' fees and court costs incurred. Defendant shall then have 10 days from the date appearing on the certificate of service of plaintiffs' damage compilation to respond.